Case No. 24-1097

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

_____

GOOGLE LLC,
                    *Plaintiff – Appellee,*
          v.

SONOS, INC.,
                    *Defendant – Appellant.*

Appeal from the United States District Court for the
Northern District of California, Case No. 3:20-cv-06754
Judge William Alsup

**CORRECTED BRIEF OF *AMICUS CURIAE*
THE GEORGE WASHINGTON UNIVERSITY LAW SCHOOL
INTELLECTUAL PROPERTY AND TECHNOLOGY LAW CLINIC
IN SUPPORT OF SONOS, INC.
REQUEST FOR REVERSAL**

Jeffrey P. Armstrong
          *Counsel of Record*
Brian C. Bianco
AKERMAN LLP
71 S. Wacker Dr., 47th Floor
Chicago, IL 60606
(312) 654-5700

jeffrey.armstrong@akerman.com

Loletta Darden
Clinic Director and Visiting
Associate Clinical Professor
THE GEORGE WASHINGTON
UNIVERSITY LAW SCHOOL
INTELLECTUAL PROPERTY AND
TECHNOLOGY LAW CLINIC
2000 H St. N.W.
Washington, D.C. 20052
(312) 498-4179
loletta.darden@law.gwu.edu

*Counsel for Amicus Curiae*
The George Washington
University Law School
Intellectual Property and
Technology Law Clinic

FORM 9. Certificate of Interest                                    Form 9 (p. 1)
                                                                    March 2023

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

# <u>CORRETED CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 24-1097 |
| **Short Case Caption** | Google LLC v. Sonos, Inc. |
| **Filing Party/Entity** | The George Washington University Law School Intellectual Property and Technology Law Clinic |

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 02/20/2024          Signature:    /s/ *Jeffrey P. Armstrong*

                          Name:         Jeffrey P. Armstrong

**FORM 9. Certificate of Interest**

Form 9 (p. 2)
March 2023

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| The George Washington University Law School Intellectual Property and Technology Law Clinic | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

|  |  |  |
|--|--|--|
|  |  |  |
|  |  |  |
|  |  |  |

**6. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☐ No ☑ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

|  |  |  |
|--|--|--|
|  |  |  |
|  |  |  |

Date: February 20, 2024                         Respectfully submitted,

                                                /s/ *Jeffrey P. Armstrong*

                                                Jeffrey P. Armstrong
                                                        *Counsel of Record*
                                                Brian C. Bianco
                                                AKERMAN LLP
                                                71 S. Wacker Dr., 47th Floor
                                                Chicago, IL 60606
                                                (312) 654-5700
                                                jeffrey.armstrong@akerman.com

                                                Loletta Darden
                                                Clinic Director and Visiting
                                                Associate Clinical Professor
                                                THE GEORGE WASHINGTON
                                                UNIVERSITY LAW SCHOOL
                                                INTELLECTUAL PROPERTY AND
                                                TECHNOLOGY LAW CLINIC
                                                2000 H St. N.W.
                                                Washington, D.C. 20052
                                                (312) 498-4179
                                                loletta.darden@law.gwu.edu

                                                        *Counsel for Amicus Curiae*
                                                The George Washington
                                                University Law School
                                                Intellectual Property and
                                                Technology Law Clinic

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST .................................................................. i

TABLE OF AUTHORITIES ................................................................... vii

STATEMENT OF IDENTITY, INTEREST, AND AUTHORITY ............ 1

STATEMENT OF NONCONTRIBUTION .............................................. 1

ARGUMENT ......................................................................................... 2

I.   The District Court's Erroneous Holding Will Hinder Small
     and Under-Resourced Businesses From Obtaining Full
     Patent Rights ............................................................................. 2

     A.   Historical and current continuation practices directly
          oppose the district court's overly-restrictive reading ............. 3

          1.   Continuations promote the useful arts as the
               Patent Act drafters sought ............................................ 4

          2.   A parent's specification notifies the market of
               possible continuation claims—a regular part of
               every-day patent prosecution ........................................ 7

     B.   Small and under-resourced businesses will not obtain
          their full rights under the district court's holding .............. 11

          1.   Up-front scorched-earth claiming is unworkable for
               businesses in a dynamic marketplace ........................... 11

          2.   The district court's holding will make a business's
               financial status a factor for obtaining full patent
               rights ......................................................................... 15

II.  The District Court's Prosecution Laches Approach Will
     Increase Small and Under-Resourced Businesses' Loss of
     Rights ....................................................................................... 20

A.    Mere pendency is not a dispositive factor of prosecution laches ................................................................. 21

    1.    This court has repeatedly refused to create a time-based presumption of unreasonable delay .................. 23

    2.    A time-based presumption will increase prosecution costs, injuring small and under-resourced businesses ..................................................... 26

B.    The district court's disregard of wrongful intent will depart from precedent and discount good faith prosecution ........................................................... 30

    1.    This court's precedent consistently considers wrongful intent............................................................. 30

    2.    Requiring wrongful intent is consistent with other unenforceability defenses.............................. 36

    3.    A wrongful intent requirement will protect small and under-resourced businesses' good faith prosecution ................................................. 37

III.    Conclusion .................................................................. 38

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Cancer Rsch. Tech. Ltd. v. Barr Lab'ys Inc.*,
    625 F.3d 724 (Fed. Cir. 2010) ............................................................. 20

*Cordance Corp. v. Amazon*,
    631 F. Supp. 2d 484 (D. Del. 2009) .............................................. 22, 38

*Crown Cork & Seal Co. v. Ferdinand Gutmann*,
    304 U.S. 159 (1938) .............................................................. 2, 4, 12, 23

*Galliher v. Cadwell*,
    145 U.S. 368 (1892) ............................................................................. 24

*Godfrey v. Eames*,
    68 U.S. (1 Wall.) 317 (1864) ................................................... 2, 3, 4, 10

*Holmberg v. Armbrecht*,
    327 U.S. 392 (1946) ...................................................................... 24, 26

*Hyatt v. Hirshfeld*,
    998 F.3d 1347 (Fed. Cir. 2021) ................................................... *passim*

*Hyatt v. Lee*,
    232 F. Supp. 3d 148 (D.D.C. 2017) ........................................ 25, 33, 35

*In re Bogese*,
    303 F.3d 1362 (Fed. Cir. 2002) ............................................... 31, 32, 34

*In re Henriksen*,
    399 F.2d 253 (C.C.P.A. 1968) ............................................................... 5

*In re Hogan*,
    559 F.2d 595 (C.C.P.A. 1977) ............................................................... 7

*Johnson & Johnston Assocs. Inc. v. R.E. Serv. Co.*,
    285 F.3d 1046 (Fed. Cir. 2002) (en banc) ......................................... 29

*Lemelson v. TRW, Inc.*,
760 F.2d 1254 (Fed. Cir. 1985) ........................................... 5

*Lemon v. Kurtzman*,
411 U.S. 192 (1973) ........................................................ 27

*Novozymes A/S v. Dupont Nutrition Biosciences APS*,
723 F.3d 1336 (Fed. Cir. 2013) .............................. 6, 10, 12

*Novozymes A/S, v. Genencor Int'l, Inc.*,
446 F. Supp. 2d 297, 331 (D. Del. 2006) ........................... 32

*Personalized Media Commc'ns, LLC v. Apple Inc.*,
57 F.4th 1346 (Fed. Cir. 2023) ................................... *passim*

*Personalized Media Commc'ns v. LLC v. Apple, Inc.*,
552 F. Supp. 3d 664 (E.D. Tex. 2021) ............................... 25

*Progressive Games Inc. v. Amusements Extra Inc.*,
51 U.S.P.Q.2d 1849 (D. Colo. 1999) ................................... 5

*Reiffin v. Microsoft Corp.*,
270 F. Supp. 2d 1132 (N.D. Cal. 2003) ............................. 33

*Seagen Inc. v. Daiichi Sankyo Co.*,
2022 U.S. Dist. LEXIS 125768 (E.D. Tex. July 15, 2022) ........... 33, 35

*Smith v. Goodyear Dental Vulcanite*,
93 U.S. (3 Otto) 486 (1877) ........................................... 4

*Symbol Techs., Inc. v. Lemelson Med., Educ. & Rsch. Found., L.P.*,
277 F.3d 1361 (Fed. Cir. 2002) .................................... 5, 23

*Symbol Techs., Inc. v. Lemelson Med., Educ. & Rsch. Found., L.P.*,
422 F.3d 1378 (Fed. Cir. 2005) ................................. *passim*

*SynQor, Inc. v. Artesyn Techs., Inc.*,
2011 U.S. Dist. LEXIS 75420 (E.D. Tex. July 11, 2011) ............. 28

*Tafas v. Doll*,
559 F.3d 1345 (Fed. Cir. 2009) ..................................... 5, 7

*Tafas v. Kappos*,
   589 F.3d 1369 (2009) (en banc)............................................................. 6

*Therasense, Inc. v. Becton, Dickinson & Co.*,
   649 F.3d 1276 (Fed.Cir.2011) ...................................................... 36, 37

*Transco Prods. v. Performance Contracting, Inc.*,
   38 F.3d 551 (Fed. Cir. 1994) ............................................................ 4, 9

*Tronzo v. Biomet*,
   156 F.3d 1154 (Fed. Cir. 1998) ............................................................ 6

*Webster Elec. Co. v. Splitdorf Elec. Co.*,
   264 U.S. 463 (1924)......................................................................... 9, 10

*Woodbridge v. United States*,
   263 U.S. 50 (1923)........................................................................ 31, 33

## Constitution and Statutes

U.S. CONST. art. I, § 8, cl. 8................................................................. 2, 13

35 U.S.C. § 120 ............................................................................... 4, 5, 16

35 U.S.C. § 121 ......................................................................................... 22

35 U.S.C. § 251 ........................................................................................... 6

## Rules and Regulations

37 C.F.R. § 1.16(h)–(i) .................................................................. 14, 15, 16

37 C.F.R. § 1.27 ....................................................................................... 17

37 C.F.R. § 1.29 ....................................................................................... 17

MANUAL OF PATENT EXAMINING PROCEDURE § 201.07............................... 7

MANUAL OF PATENT EXAMINING PROCEDURE § 607 ................................. 18

MANUAL OF PATENT EXAMINING PROCEDURE § 800 ................................. 18

## Legislative Materials

*Amendment in the Nature of a Substitute to H.R. 2795,*
    *the "Patent Act of 2005":  Hearing on H.R. 2795 Before the Subcomm.*
    *on Cts., the Internet, & Intell. Prop. of the H. Comm.*
    *on the Judiciary*, 109th Cong. (2005)  ......................................... 27, 28

## Administrative Materials

Hearing Transcript,
    USPTO Patent Public Advisory Committee Public Hearing
    on the Proposed Patent Fee Schedule (May 18, 2023),
    https://www.uspto.gov/sites/default/files/documents/
    PPAC_Hearing_Transcript-20230518.pdf................................. *passim*

USPTO, PATENT PUBLIC ADVISORY COMMITTEE
    FEE SETTING REPORT (Aug. 14, 2023) ......................................... 16, 19

USPTO, Presentation
    at USPTO's PPAC Patent Fee Schedule Hearing (May 18, 2023),
    https://www.uspto.gov/sites/default/files/documents/PPAC_Patent-
    Fee-Adjustment-Proposals-20230518.pdf
    (presentation of Jay Hoffman, CFO) ................................................. 29

## Other Authorities

CHISUM ON PATENTS § 13.02 .................................................................. 3, 4

CHISUM ON PATENTS § 13.05 .................................................................. 13

Gene Quinn,
  *The Cost of Obtaining a Patent in the US*,
  IPWatchdog (Apr. 4, 2015, 3:05 PM),
  https://ipwatchdog.com/2015/04/04/the-cost-of-obtaining-a-patent-in-
  the-us/id=56485/ ................................................................................ 19

Kenneth Zahringer et al.,
  *Time to Patent at the USPTO:*
  *The Case of Emerging Entrepreneurial Firms*,
  43 J. Tech. Transfer 923 (2018) .......................................................... 37

Mike Pellegrino, Data Compilation,
  Continuation Assets Between Priority
  Dates and Application Dates,
  PELLEGRINO&ASSOCIATES (Feb. 14, 2024) ................................... 7, 8, 9

MITRA-KAHN ET AL.,
  PATENT BACKLOGS, INVENTORIES AND PENDENCY:
  AN INTERNATIONAL FRAMEWORK.
  UKIPO & USPTO JOINT REPORT (2013) ........................................... 26

Robert A. Migliorini,
  *Lessons for Avoiding Inequitable Conduct and*
  *Prosecution Laches in Patent Prosecution and Litigation*,
  46 IDEA 221 (2006) .......................................................................... 36

*USPTO Fee Schedule:  Patent Fees*,
  USPTO.gov (last visited Feb. 19, 2024),
  https://www.uspto.gov/learning-and-resources/fees-and-
  payment/uspto-fee-schedule#Patent%20Fees ....................... 15, 16, 17

WALKER ON PATENTS § 8:145 .................................................................5

**STATEMENT OF IDENTITY, INTEREST, AND AUTHORITY**

The George Washington University Law School Intellectual Property and Technology Law Clinic is a nonprofit legal clinic operated out of the Jacob Burns Community Legal Clinics. The clinic is interested in this case because the district court's holding stands to hinder under-resourced innovators. The clinic has filed a motion for leave to file its *amicus* brief under Fed. Cir. R. 29(a) and FRAP 29(a)(3) in light of party opposition.

**STATEMENT OF NONCONTRIBUTION**

Pursuant to Fed. R. App. P. 29(a)(4)(E), *Amicus Curiae* The George Washington University Law School Intellectual Property and Technology Law Clinic certifies that no counsel representing a party in this proceeding authored this brief in whole or in part, and no party or counsel representing a party in this proceeding made a monetary contribution intended to fund the preparation or submission of this brief. Furthermore, no person or entity, other than *amicus curiae*, its members, or its counsel, made a monetary contribution to the preparation or submission of this brief.

# ARGUMENT

## I.    The District Court's Erroneous Holding Will Hinder Small and Under-Resourced Businesses From Obtaining Full Patent Rights

The Framers empowered Congress to enact patent laws that protect inventors' rights, drive innovation, and expand United States industries by "promot[ing] the progress of . . . useful arts."  U.S. CONST. art. I, § 8, cl. 8.   Continuation applications furthers this goal.   A continuation application is a second application filed during the pendency of a prior application—i.e., the parent—disclosing all or a substantial part of the parent's subject matter and naming one common inventor.  The Supreme Court deemed the relationship between the parent and continuation to constitute "one continuous application" and, therefore, one continuous prosecution "within the meaning of the law."  *Godfrey v. Eames*, 68 U.S. (1 Wall.) 317, 326 (1864).

Continuations provide inventors an opportunity to claim the full scope of their inventions.   They also prevent second-comers from asserting rights over subject matter disclosed and continuously-prosecuted before the patent office ("USPTO").  *See Crown Cork & Seal Co. v. Ferdinand Gutmann*, 304 U.S. 159, 165, 168 (1938).

- 2 -

The district court's improper ruling on continuation practice (1) ignores the necessity of continuation practice in providing inventors the ability to claim the full scope of their inventions and (2) unduly burdens small and under-resourced businesses (collectively, "small businesses") by imposing unmanageable and unrealistic time limitations on the prosecution timeline.

### A. Historical and current continuation practices directly oppose the district court's overly-restrictive reading

Continuation practice is a judicially developed doctrine that gained statutory recognition with the enactment of Section 120 of the Patent Act of 1952. *See* CHISUM ON PATENTS § 13.02 (historical development). Continuations promote innovation in two key ways: First, they give a patentee time to determine which disclosed embodiments warrant patent protection. Second, they encourage design-around efforts, as the parent's publication notifies the market of the disclosed invention and possible claims to be drawn thereto during what the Court deemed a continuous prosecution of the parent's disclosed inventions. *See Godfrey*, 68 U.S. (1 Wall.) 317, 326 (1864). History and current practices oppose the district court's misguided impression of continuation practice's pendency and notice functions.

### 1. Continuations promote the useful arts as the Patent Act drafters sought

Continuation applications developed as a common law practice.  *See generally* CHISUM ON PATENTS § 13.02.  Early Supreme Court cases found continuation application prosecution proper where the application's disclosure substantively remained unchanged throughout prosecution.  *See, e.g.*, *Godfrey*, 68 U.S. (1 Wall.) at 324–26; *Smith v. Goodyear Dental Vulcanite*, 93 U.S. (3 Otto) 486, 500–01 (1877).  The Court emphasized how "continuity of *disclosure*"—not "continuity of *claims*"—showed an "inten[t] to retain, not abandon, the disclosed information."  CHISUM ON PATENTS § 13.02, at 2–3 (citing *Crown Cork*, 304 U.S. at 165) (emphasis in original).

Congress codified continuation practice in the Patent Act of 1952 and maintained the fundamental principle of continuity.  *See* 35 U.S.C. § 120.  Section 120 accords a continuation application "the benefit of [its parent's] filing date" if the continuation meets four requirements associated with the parent:  (1) copendency; (2) continuity of disclosure; (3) common inventorship; and (4) cross-reference.  *Id.*; *see also Transco Prods. v. Performance Contracting, Inc.*, 38 F.3d 551, 555–56 (Fed. Cir. 1994).  Relevant here, the first two factors are discussed in turn.

First, copendency exists when a continuation is filed before the parent is patented, abandoned, or terminated. *See* 35 U.S.C. § 120. When "earlier applications are all linked together as continuations in a single chain," there exists a "historical[] and conceptual[] equivalent to . . . a single . . . [long]-pend[ing]" application. WALKER ON PATENTS § 8:145; *see also Lemelson v. TRW, Inc.*, 760 F.2d 1254, 1266–67 (Fed. Cir. 1985) ("without hiatus"). "The legislative history of Section 120 does not indicate any Congressional intent to alter the Supreme Court's interpretation of continu[ations]." *Symbol Techs., Inc. v. Lemelson Med., Educ. & Rsch. Found., L.P.*, 277 F.3d 1361, 1363, 1366 (Fed. Cir. 2002) ("*Symbol I*").

Congress enacted no filing limitation on continuations—as it did with broadening reissue applications—and "[i]f a restriction is to be imposed, . . . it is for the Congress to decide," not the courts. *In re Henriksen*, 399 F.2d 253, 256, 262 (C.C.P.A. 1968); *see also Progressive Games Inc. v. Amusements Extra Inc.*, 51 U.S.P.Q.2d 1849, 1853 (D. Colo. 1999) (stating reissue time limitations create "a negative inference that continuation applications should not be time-barred"); *Tafas v. Doll*, 559 F.3d 1345, 1367–68 (Fed. Cir. 2009) (noting a lack of statutory limitations

on serial continuations), *vacated as moot by Tafas v. Kappos*, 589 F.3d 1369 (2009) (en banc).  *See generally* 35 U.S.C. § 251.

The timeline for filing continuation applications, therefore, remains open throughout copendency, even if pendency lasts a long time.  *See* Hearing Transcript, USPTO Patent Public Advisory Committee Public Hearing on the Proposed Patent Fee Schedule, at 111:1–4 (May 18, 2023), https://www.uspto.gov/sites/default/files/documents/PPAC_Hearing_Transcript-20230518.pdf [hereinafter "Hr'g Tr."] (testimony of Brian Kearns, Director, Ericsson Pat. Unit USA) ("It may take years for the applicant to determine which embodiments are both commercially valuable and entitled to patent protection over the prior art.").  By suggesting a long continuation pendency is problematic and must be limited, the district court defied congressional intent, improperly legislated its own pendency limitation, and overrode Congress's open-window continuation practice.  *See* Appx079–081.

Second, continuity of disclosure exists when continuation claims "find support"—even inherently—in the parent's written description "sufficient to satisfy § 112."  *Novozymes A/S v. Dupont Nutrition Biosciences APS*, 723 F.3d 1336, 1345 (Fed. Cir. 2013); *see also Tronzo v.*

*Biomet*, 156 F.3d 1154, 1159 (Fed. Cir. 1998) (inherency). Continuity of disclosure, therefore, "is the same for all applications, whether of long or short pendency." *In re Hogan*, 559 F.2d 595, 604 n.13 (C.C.P.A. 1977); *see also* Manual of Patent Examining Procedure ("MPEP") § 201.07.

The district court overstepped by imposing an arbitrary and capricious time limitation—"contrary to the statute" and congressional intent—based on its preference for short continuation filing and prosecution timelines. The district court's decision will have a hindering effect on small businesses—likely limiting their applications to the parent due to the associated increased filing costs, *infra* Section I.B.2—chilling the inventor's rights to claim the full scope of their inventions. *See Tafas*, 559 F.3d at 1367; *see also Hogan*, 559 F.2d at 604 n.13.

## 2. A parent's specification notifies the market of possible continuation claims—a regular part of every-day patent prosecution

Continuations are a regular and routine part of patent prosecution. *See* Mike Pellegrino, Data Compilation, Continuation Assets Between Priority Dates and Application Dates, Pellegrino&Associates (Feb. 14,

2024) (unpublished compilation) [hereinafter "Pellegrino, Compilation"].[1]
Over the past decade, 2014–2023, the USPTO issued 671,966 patents
from continuation applications, with 94,319 patents issuing from
continuation applications just in 2023. *Id.* Of the 671,966 patents
issuing from continuations, 99,696 issued from continuation applications
having filing dates at least eight years after their priority date, with
53,719 having a filing date at least ten years after their priority date. *Id.*
*See generally* Appx080 (commenting on patents with eight- and ten-year
delays).

The district court's attempt to impose arbitrary deadlines on filing
continuation applications does not live in reality. In fact, if left intact,
the district court's decision will call into question the enforceability of
nearly 100,000 issued patents. *See* Appx080, Appx085; Pellegrino,
Compilation. Indeed, accused infringers may argue unenforceability in
any case involving a patent issuing from a continuation application as
the district court even commented on the existence of a six-year time bar

---

[1] Patent valuation expert Michael Pellegrino of Pellegrino & Associates,
LLC provided this data compilation, which relies on USPTO continuation
patent grant data between January 1, 2014 and December 31, 2023
including patent grants and application publications.

(though in a different laches context), potentially calling into question even more than the 100,000 already-at-risk issued patents. *See* Appx079; Pellegrino, Compilation.

The district court failed to recognize the 1.5-century-long trend of continuation practice when it keyed-in on Sonos's 13-year pendency. *See* Appx051, Appx079–81, Appx085. The district court's treatment of continuations and its attempt to lump-sum all moments of Sonos's prosecution is inconsistent with legally-recognized continuation practice. It is also directly contrary to Supreme Court precedent. *Cf. Webster Elec. Co. v. Splitdorf Elec. Co.*, 264 U.S. 463, 471 (1924) ("[D]ivisional applications are not to be dealt with in a hostile spirit.").[2]

Ignoring the continuity of disclosure principle, the district court improperly disregarded the necessity of looking at the parent's *specification*—not just the claims—to find support for the subject matter claimed in the later filed continuation. *Compare* Appx083 ("We do not look to the specifications of much earlier related patents to define the

---

[2] While focused on divisional applications, the case is instructive for continuations as both are continuing applications. *See Transco*, 38 F.3d at 555–56.

scope of the patented invention.") *with Novozymes*, 723 F.3d at 1345 (stating added claims must "satisfy § 112 in the [parent's] written description").  Not only does publication of the parent specification notify the public of the covered subject matter, it also notifies the public of the potential for additional claims to be added during continuation practice—a practice the Court deemed to be "one continuous prosecution" of the parent disclosure.  *Godfrey*, 68 U.S. (1 Wall.) at 326; *see also* Hr'g Tr., at 112:10–17 (testimony of Brian Kearns) ("[A] continuing patent application will have the same term as its parent.  [The] [p]ublic will have sufficient notice of their relation."); *cf. Webster*, 264 U.S. at 471 (explaining a continuation claiming an invention the parent disclosed but did not claim is "given the [parent's] filing date, with all of its priority of rights").

Here, the district court held contradictory positions on continuity of disclosure and market notice:  (1) the parent's specification was clear enough for Google to believe its product—practicing Sonos's continuation claims—was left to the public domain; but (2) the parent's disclosure was insufficient to capture the continuation's claims.  *See* Appx76, Appx083. Both positions cannot simultaneously be true.

## B.    Small and under-resourced businesses will not obtain their full rights under the district court's holding

The district court took issue with Sonos's thirteen-year prosecution and sought to solve the supposed problem with a wholly unreasonable and unworkable solution—i.e., scorched-earth filing at the parent application stage. *See* Appx081. Scorched-earth claiming is neither practically attainable, financially feasible, nor functionally workable for small businesses. *Cf.* Hr'g Tr., at 113:10–20 (testimony of Brian Kearns) (arguing up-front claiming is "unrealistic"). There are two core flaws with the district court's solution: (1) the market is too dynamic to require complete up-front claiming from inventors—large or small—relying on commercialization to determine viability, and (2) stockpiling the parent application turns financial status into a factor for obtaining patent rights. Each is discussed in turn.

### 1. Up-front scorched-earth claiming is unworkable for businesses in a dynamic marketplace

Continuations allow an applicant to consider how the market reacts to their disclosed and claimed invention and to determine if further prosecution is necessary. *See* Hr'g Tr., at 111:4–7 (testimony of Brian Kearns) ("[C]urrent continuation practice allows applicants to track

these developments efficiently and seek the full scope of patent protections to which they are entitled."). Requiring applicants to claim up-front all possible claims potentially existing for a disclosed invention without knowing anything about the market is unattainable and unworkable for small businesses, particularly because they rely on investors and industry response. *See id.* at 113:14–20 (testimony of Brian Kearns) ("[R]equir[ing] an applicant to know exactly which embodiments are most commercially valuable and patentable over the prior art at the time of filing . . . is simply unrealistic."). The district court took issue with what it called "daisy chain" continuations, connecting this with "a clear abuse of the [US]PTO's patent examination system." Appx098. Contrary to the district court's reasoning, continuation practice safeguards against unfairness by *prohibiting* claims to subject matter the parent *does not support. See Novozymes*, 723 F.3d at 1345; *Crown Cork*, 304 U.S. at 165, 168.

A critical factor the district court overlooked in its analysis is how market response is a key aspect of continuation practice. At the beginning of the patent prosecution process, typically, applicants do not know how the market will react to their invention, so they file later

applications including claims to inventions the market dictates as viable. *See* Hr'g Tr., at 111:1–7 (testimony of Brian Kearns) (explaining parties rely on commercial developments in prosecution). This conduct does not abuse the prosecution process but permits applicants to test and access the full potential and scope of their disclosed invention. *See id.* ("It may take years for the applicant to determine which embodiments are both commercially valuable and entitled to patent protection over prior art."). *See generally* CHISUM ON PATENTS § 13.05, at 10.

Requiring scorched-earth claiming and circumventing the applicant's chance to consider the full scope of their rights violates the constitutional mandate to "promote the progress of . . . useful arts, by *securing* for limited times to . . . *inventors the exclusive right to their . . . discoveries*." U.S. CONST. art. I, § 8, cl. 8 (emphasis added). This constitutional violation is only furthered by the district court's indirect suggestion of a time bar on prosecution pendency, which is contrary to Supreme Court precedent and congressional intent. *See* Appx079, Appx081; *supra* Section I.A.1. Additionally, a time bar is also improper because it is a roundabout way of requiring scorched-earth claiming.

USPTO rules also recognize scorched-earth claiming is unnecessary, intimating applicants need not claim every possible embodiment in the original application. *Cf.* Hr'g Tr., at 113:10–13 (testimony of Brian Kearns) ("[E]xcess claim fees already encourage applicants to be efficient in the number of claims they file, pursuing claims of differing scope or embodiments in continuing applications."). Further, scorched-earth claiming will force inventors to spend their time and energy prosecuting patents instead of innovating. Consequently, applicants are left with an unjust paradoxical dilemma under the district court's treatment, both options resulting in loss of rights: (1) if applicants claim everything up-front, they are burdened with excessive fees and preoccupied with unmanageable prosecution; (2) if applicants seek continuations resulting in long pendency, the court may impose prosecution laches. *Compare* 37 C.F.R. § 1.16(h)–(i) *with* Appx080.

The patent prosecution system is meant to promote innovation and encourage inventors to utilize the resources the USPTO offers to protect them, but the district court sought to impose an unworkable standard with no way out except for a loss of rights and a door for copyists to exploit. *Cf.* Hr'g Tr. at 69:10–13 (testimony of Laura Sheridan, Head of

Patent Policy, Google LLC) (stating improvements to patent quality "must be accomplished . . . [without] hinder[ing] the ability of our small and micro entities to pursue patent protection for their innovations").

Even if small businesses could conduct scorched-earth claiming, this practice is rejected at the USPTO and is impractical. The USPTO only permits filing a limited number of claims without imposing an excess claims fee. *See* 37 C.F.R. § 1.16(h)–(i); *see also USPTO Fee Schedule: Patent Fees*, USPTO.gov (last visited Feb. 19, 2024), https://www.uspto.gov/learning-and-resources/fees-and-payment/uspto-fee-schedule#Patent%20Fees.

### 2. The district court's holding will make a business's financial status a factor for obtaining full patent rights

In addition to the impracticalities discussed above, scorched-earth claiming imposes a huge financial burden on small and micro entity applicants. *See* Hr'g Tr., at 80:19–81:3 (testimony of Courtenay Brinckerhoff, Vice Chair, Intell. Prop. Owner's Ass'n) ("Prosecuting multiple related applications simultaneously can make it complicated and costly to comply with duty of disclosure requirements."). The district court's solution effectively writes-in a new factor for determining whether

a patent should be granted—i.e., applicant's financial status. *See generally* 35 U.S.C. § 120 (lacking a financial status or initial simultaneous claiming requirement).

The up-front monetary demands of scorched-earth claiming deals a crushing blow to small businesses. *Cf.* USPTO, PATENT PUBLIC ADVISORY COMMITTEE FEE SETTING REPORT 2 (Aug. 14, 2023) ("The . . . fee increase . . . was designed to front load fees . . . . [W]e believe it places an undue burden on individual inventors and small businesses.") [hereinafter "PPAC REPORT"]. To deter claim-dumping, the USPTO limits applicants by charging an extra fee in addition to the basic claim fee for each independent claim in excess of three independent claims and each claim—whether dependent or independent—in excess of twenty claims. *See* 37 C.F.R. § 1.16(h)–(i). These costs add up. *See generally USPTO Fee Schedule: Patent Fees*, USPTO.gov (last visited Feb. 19, 2024), https://www.uspto.gov/learning-and-resources/fees-and-payment/uspto-fee-schedule#Patent%20Fees (providing the cost of all patent application filing fees). The twenty-claim base cost ranges $64 to $320 per application and the excess fees cost ranges $96 to $480 per independent claim over three and $20 to $100 per claim over twenty,

depending on entity status. *See id.*; *see also* 37 C.F.R. § 1.27 (small entity); 37 C.F.R. § 1.29 (micro entity).

The patent family at issue, for example, includes a parent and eleven continuations, from which only the parent and one continuation contain excess claims over twenty—i.e., thirteen excess claims each. This history is shown in Table 1:

TABLE 1:
Excess Claim Costs Case Study:
Sonos, Inc. Application # 11/853,790

| Patent Number | Independent Claims | Total Claims | Excess Independent Claims Over 3 | Excess Claims Over 20 | Regular Entity Excess Cost | Small Entity Excess Cost | Micro Entity Excess Cost |
|---|---|---|---|---|---|---|---|
| 8,483,853 | 3 | 33 | 0 | 13 | $1,300 | $520 | $260 |
| 11,388,532 | 3 | 33 | 0 | 13 | $1,300 | $520 | $260 |
| 10,469,966 | 3 | 20 | | | | | |
| 8,934,997 | 3 | 20 | | | | | |
| 9,749,760 | 3 | 20 | | | | | |
| 9,813,827 | 3 | 20 | | | | | |
| 8,886,347 | 3 | 20 | 0 | | $0 | | |
| 8,843,228 | 3 | 16 | | | | | |
| 10,897,679 | 3 | 20 | | | | | |
| 9,860,657 | 3 | 20 | | | | | |
| 9,344,206 | 3 | 20 | | | | | |
| 10,848,885 | 3 | 20 | | | | | |
| | | | | | | | |
| Standard Continuation Practice Totals | 36 | 262 | 0 | 26 | $2,600 | $1,040 | $520 |
| | | | | | | | |
| Scorched-Earth Claiming Totals | 36 | 262 | 33 | 242 | $40,040 | $16,016 | $8,008 |

Under current continuation practice, a party having two separate thirteen excess claim filings would pay a total in excess claim fees of $2,600, $1,040, or $520 depending on entity status. If scorched-earth claiming is required for this patent family, the applicant would file all claims from the parent and all eleven continuations up-front, totaling to thirty-six independent claims and 262 total claims—i.e., thirty-three excess independent claims and 242 total excess claims. This would cost $40,040, $16,016, or $8,008 depending on entity status—a cost 15.4-times greater than for current continuation practice. Additionally, the USPTO would almost certainly issue a restriction requirement, forcing the applicant to elect one invention, cancel the unelected claims, and refile them as divisional applications, without getting a refund of their payment for excess claim fees. *See* MPEP §§ 607, 800. Notwithstanding other charges, these excess claim fees alone would likely bar small businesses from prosecuting the full scope of their inventions. *See* Hr'g Tr., at 92:1–4 (testimony of Ann M. Mueting, President-Elect, AIPLA) ("[I]ndependent inventors, startups, and small businesses . . . are most sensitive to even small fee increases.").

Congress and the USPTO provide avenues to reduce costs for small businesses through entity statuses, so it is contradictory to the USPTO's treatment of small businesses to revert these financial breaks by requiring more up-front fees to file a patent application. *See* PPAC REPORT 2 ("The impact of costs on applicants, particularly small inventors, is an important factor . . . . It is important to both PPAC and the USPTO that price does not significantly inhibit an inventor's willingness to seek patent protection.").

The district court overstepped its judicial authority by implicitly rewriting the Patent Act and promoting scorched-earth claiming. *See* Appx081 (stating Sonos should have filed "parallel applications" instead of a "string" of applications). While the district court's ruling impacts the costs to all applicants, it detrimentally hinders a small business's ability to seek full patent protection due to excessive costs. *See generally* Gene Quinn, *The Cost of Obtaining a Patent in the US*, IPWatchdog (Apr. 4, 2015, 3:05 PM), https://ipwatchdog.com/2015/04/04/the-cost-of-obtaining-a-patent-in-the-us/id=56485/ (linking high prosecution costs with inventors needing to "give up on the project, do it themselves[,] or seek [non-attorney, non-agent] deep-discount providers"). Surely, exclusion

based on financial status was not the effect the Framers contemplated when drafting the patent clause.

## II.   The District Court's Prosecution Laches Approach Will Increase Small and Under-Resourced Businesses' Loss of Rights

Prosecution laches is an equitable affirmative defense to patent infringement rendering patents unenforceable. *See Personalized Media Commc'ns, LLC v. Apple Inc.*, 57 F.4th 1346, 1354 (Fed. Cir. 2023) ("PMC"); *Hyatt v. Hirshfeld*, 998 F.3d 1347, 1359–60 (Fed. Cir. 2021). This court has affirmed the doctrine, which finds its roots in early twentieth-century Supreme Court cases, in only a few instances where patentees engaged in unreasonable and inexcusable delays in prosecution that constituted an "*egregious misuse* of the statutory patent system." *Cancer Rsch. Tech. Ltd. v. Barr Lab'ys Inc.*, 625 F.3d 724, 728 (Fed. Cir. 2010) (emphasis added). The district court's erroneous application of the doctrine to legitimate serial-continuation practice finds no precedential support in law, and it is detrimental to small businesses who resort to such practices for survival and footing to compete effectively in the marketplace.

**A.    Mere pendency is not a dispositive factor of prosecution laches**

Prosecution laches requires proof of two elements:    (1) the patentee's delay of prosecution must be unreasonable and inexcusable under a totality of the circumstances and (2) the accused infringer must have suffered prejudice because of the delay.  *See PMC*, 57 F.4th at 1354. Although there are no "firm guidelines" for determining what constitutes unreasonable and inexcusable delay, this court clarified the assessment should be based on the totality of the circumstances as a matter of equity. *Symbol Techs., Inc. v. Lemelson Med., Educ. & Rsch. Found., L.P.*, 422 F.3d 1378, 1385–86 (Fed. Cir. 2005) ("*Symbol II*") (en banc); *PMC*, 57 F.4th at 1354; *Hyatt*, 998 F.3d at 1360.

With regard to refiling applications—including continuations—this court has warned against blurring the legitimate grounds for refiling an application with illegitimate delays giving rise to laches.  *See Symbol II*, 422 F.3d at 1385.  "[J]ustifiably, one might refile an application to add [additional claims or] subject matter in order to attempt to support

broader claims as the development of an invention progresses,"[3] but "refiling an application solely containing previously allowed claims for the . . . purpose of delaying their issuance can be considered an abuse." *Id.*

"Legitimate grounds for refiling" or continuation application prosecution becomes blurred when a court finds prosecution laches based on the mere passage of time—as did the district court. *Compare PMC*, 57 F.4th at 1355–56 (affirming prosecution laches where patentee "expressly adopt[ed] and implement[ed] dilatory prosecution strategies, specifically to ambush [competitors] many years after [it] filed its applications") *with Cordance Corp. v. Amazon*, 631 F. Supp. 2d 484, 491 (D. Del. 2009) (denying prosecution laches, despite over eight years of prosecution pendency, because patentee was diligently "prosecuting other applications in the patent family" and justifiably pursued continuation applications as its invention developed due to its limited resources). These findings comport with this court's decision that "[t]he

---

[3] While this case discusses continuations-in-part ("CIP"), it is instructive for continuations because part of a CIP includes the same subject matter as its parent. *See* 35 U.S.C. § 121.

doctrine should be applied only in egregious cases" and not merely based on the passage of time, "lest statutory provisions be unjustifiably vitiated." *Symbol II*, 422 F.3d at 1385.

### 1. This court has repeatedly refused to create a time-based presumption of unreasonable delay

No presumption of unreasonable delay based on pendency exists for prosecution laches. In *Symbol II*, this court explicitly held "there are no strict time limitations for determining whether continued refiling of patent applications is a legitimate utilization of statutory provisions or an abuse of those provisions." 422 F.3d at 1385 (noting the Supreme Court found "the presumptive two-year time limit it made in *Webster* was dictum" because it was not related to the question of laches on which the case was decided); *see also Symbol I*, 277 F.3d at 1364 (citing *Crown Cork*, 304 U.S. at 167).

This court has also implicitly refused to presume unreasonable delay based on time by insisting on weighing all relevant facts as part of its totality of the circumstances analysis. *See Hyatt*, 998 F.3d at 1366 (refusing to consider time dispositive in unreasonable delay analysis, suggesting Hyatt had "the opportunity to avoid prosecution laches," even

decades after his initial filing, had he cooperated with the PTO when it "notified [him] of its own obligations and requirements"); *PMC*, 57 F.4th at 1355–56 (affirming a finding of unreasonable delay because the district court "did not disregard or ignore relevant facts" in its analysis).

This court's consistent refusal to impose a time-based presumption of unreasonable delay finds support in the Supreme Court's equity precedents. *See Holmberg v. Armbrecht,* 327 U.S. 392, 396 (1946); *Galliher v. Cadwell*, 145 U.S. 368, 373 (1892). In *Galliher*, the Court established "laches is not like limitation, *a mere matter of time*; but principally a question of the inequity of permitting the claim to be enforced." 145 U.S. at 373 (emphasis added).

Here, the district court's holding effectively creates a time-based presumption of unreasonable delay because it heavily emphasized the magnitude of the delay with nothing more supporting its conclusion. *See* Appx080–81 ("The magnitude of [Sonos's] delay in presenting [its] claims for prosecution suffices to invoke prosecution laches.") (citing *Hyatt*, 998 F.3d at 1367). The district court went further to allude to a "presumption that a delay of more than six years is unreasonable, inexcusable and prejudicial." Appx079; *see also* Appx80 (noting unenforceability "based

on an eight-year delay"). Accordingly, the district court erroneously misconstrued *Hyatt*'s presumption of prejudice based on "unreasonable and unexplained prosecution delay of six years or more" to allude to a presumption of unreasonable delay based on time. 998 F.3d at 1370.

Prejudice and unreasonable delay, however, are distinctly separate. *Hyatt* involved a presumption of *prejudice*, not a presumption of *unreasonable delay*, and the prejudice presumption only applied after finding unreasonable delay based on the *totality of the circumstances*. *See id.* at 1367–70 (emphasis added). Unreasonable delay, therefore, is required for the presumption of prejudice to be triggered. *See Hyatt v. Lee*, 232 F. Supp. 3d 148, 156 (D.D.C. 2017) ("When a delay is unreasonable, prejudice can be presumed.") (citation omitted). Lastly, a district court has recently expressly rejected imposing an unreasonable delay presumption based on time in an infringement case. *See Personalized Media Commc'ns v. LLC v. Apple, Inc.*, 552 F. Supp. 3d 664, 685 (E.D. Tex. 2021) (Judge Rodney Gilstrap) (declining to impose a presumption of prejudice based on a six-year delay in the context of infringement reasoning *Hyatt* "is clearly limited to 'the context of a § 145 action'") (citation omitted), *aff'd, PMC*, 57 F.4th 1346 (Fed. Cir. 2023).

Like *PMC* and unlike *Hyatt,* this is an infringement case involving a prosecution laches defense. The district court erroneously sought to establish a presumption of unreasonable delay based on a mere passage of time, which is inconsistent with longstanding precedent basing unreasonable delay on the totality of the circumstances. *See* Appx081. Further, a time-based presumption violates equity principles. *See Holmberg,* 327 U.S. at 396. Making equity determinations based on a "mere passage of time" is simply a mechanical rule, and "[e]quity eschews mechanical rules." *Id.*

### 2. A time-based presumption will increase prosecution costs, injuring small and under-resourced businesses

Modern-day prosecution's complexity often leads to delays—many beyond the patentee's control—such as delays due to the technology's nature and complexity or the USPTO's inefficiencies. *See* MITRA-KAHN ET AL., PATENT BACKLOGS, INVENTORIES AND PENDENCY: AN INTERNATIONAL FRAMEWORK. UKIPO & USPTO JOINT REPORT (2013). Consequently, limiting a reasonable patent prosecution to a fixed time—e.g., six or eight years—is unworkable and unfair. *Cf. Lemon v.*

*Kurtzman*, 411 U.S. 192, 200 (1973) ("[E]quitable remedies are a special blend of what is necessary, what is fair, and what is workable."). As noted above, normal continuation prosecution pendency may stretch beyond eight and even ten years. *See supra* Section I.B.1. Imposing arbitrary timelines presuming what is normal as unreasonable would result in thousands of unenforceable properly-prosecuted patents. *See supra* Section I.B.1.

On the other hand, the practice of separating patent filings through serial continuations—which inherently results in longer pendency—is proven to be more cost-effective compared to filing multiple patents in parallel up-front. *See supra* Section I.B.2; *Amendment in the Nature of a Substitute to H.R. 2795, the "Patent Act of 2005": Hearing on H.R. 2795 Before the Subcomm. on Cts., the Internet, & Intell. Prop. of the H. Comm. on the Judiciary*, 109th Cong. 32, 2 (2005) (statement of Robert B. Chess, Exec. Chairman, Nektar Therapeutics, on behalf of the biotechnology industry organization) ("[P]rosecution of multiple [parallel] applications is extremely costly.") [hereinafter "H.R. 2795"].

Additionally, imposing a time limitation on patent prosecution is especially problematic for small businesses who resort to longer pendency and cost-effective means of filing for survival. *See SynQor, Inc. v. Artesyn Techs., Inc.*, 2011 U.S. Dist. LEXIS 75420, at *14 (E.D. Tex. July 11, 2011) (finding startup's file-then-claim-broader strategy based on market development credible because startups have limited resources and "do[] [not] make money right away," so they must "prioritize which patent claims to pursue at which times" to maneuver high prosecution costs). To attract investors and secure funding, small businesses need time for the market to appreciate the value of their inventions. *See* H.R. 2795 at 3 (stating inventors use market response time after initial filing—commonly 12–15 years in some industries—to attract investors and obtain market capital while filing continuations). This common practice guarantees small businesses the full protection to their patent rights and does not prejudice competitors who are put on notice of the invention and its scope of possible claims by the original parent disclosure. *See supra* Section I.A.2.

Imposing a time limit on patent prosecution forces these entities to either claim their invention prematurely—risking dedication to the

public of unclaimed matter—or losing priority and patentability by waiting until the contours of their invention are well defined before filing new patent applications at a higher cost. *See Johnson & Johnston Assocs. Inc. v. R.E. Serv. Co.*, 285 F.3d 1046, 1054 (Fed. Cir. 2002) (en banc) ("[S]ubject matter disclosed but not claimed is dedicated to the public.") (citation omitted); Hr'g Tr. at 81:4–7 (testimony of Courtenay Brinckerhoff) ("Most applicants wait to file continuations so they can make informed decisions over whether a further application is even needed and also to spread out patent costs."); *see also supra* Section I.B.2. Both choices increase the financial burden of small businesses and undermine the value of their patents, which is inconsistent with recent legislative efforts. *See* USPTO, Presentation at USPTO's PPAC Patent Fee Schedule Hearing, at 5 (May 18, 2023), https://www.uspto.gov/sites/default/files/documents/PPAC_Patent-Fee-Adjustment-Proposals-20230518.pdf (presentation of Jay Hoffman, CFO) (explaining the Unleashing Americans Inventors Act of 2022 aimed at reducing barriers to entry into patent system for small and micro entities by discounting filing fees up to 60% and 80%, respectively).

**B.** **The district court's disregard of wrongful intent will depart from precedent and discount good faith prosecution**

In addition to the improper emphasis on the magnitude of the delay, the district court failed to consider evidence of wrongful intent in its totality of the circumstances analysis. *Cf.* Appx079–82 (finding unreasonable delay based on Sonos's thirteen-year passage of time to file its continuation and asserting it was "sufficient to trigger prosecution laches" because it "would have been a small step for Sonos to amend those [earlier] applications" instead). The district court's failure to account for all relevant facts, including evidence of wrongful intent to delay—or lack thereof—renders its analysis lacking under the totality of circumstances. *See Hyatt*, 998 F.3d at 1359–66 (holding the district court repeatedly failed to consider "relevant evidence of conduct causing delay," including a prosecution approach "guarantee[ing] indefinite prosecution delay").

### 1. This court's precedent consistently considers wrongful intent

A finding of intentional delay is a bedrock principle underlying the prosecution laches doctrine. In the early 1900s, the Supreme Court established prosecution laches on the premise that "[a]ny practice by the inventor . . . [where] he *deliberately* and *without excuse* postpones beyond

the date of the actual invention, the beginning of the term of his monopoly . . . is an evasion of the statute and defeats its benevolent aim." *Woodbridge v. United States*, 263 U.S. 50, 56 (1923) (emphasis added).

Adhering to this principle, this court has only found unreasonable delay in cases where patentees took *deliberate* actions to delay prosecution. *See PMC*, 57 F.4th at 1353 ("[T]he only rational explanation for PMC's approach to prosecution is a deliberate strategy of delay"; "PMC's actions were a conscious and egregious misuse of the statutory patent system.") (citation omitted); *Hyatt*, 998 F.3d at 1368–71 (finding Hyatt filing 381 long and complex applications, requiring "532 years of examin[ation] time," amounted to unreasonable delay because "Hyatt adopted an approach to prosecution that all but guaranteed indefinite prosecution delay"); *Symbol II*, 422 F.3d at 1385 (holding actions taken "for the business purpose of delaying . . . issuance can be considered an abuse"); *In re Bogese*, 303 F.3d 1362, 1365 (Fed. Cir. 2002) (affirming prosecution laches where patentee engaged in "deliberate . . . conduct . . . result[ing] in exceptional delay in advancing" patent prosecution and issuance).

Where subjective intent of deliberate delay could not be proven, courts have inferred wrongful intent from conduct. *See Novozymes A/S, v. Genencor Int'l, Inc.*, 446 F. Supp. 2d 297, 331 (D. Del. 2006) ("Intent need not be proven by direct evidence; it is most often proven by a showing of acts, the natural consequences of which are presumably intended by the actor.") (citation omitted). *Compare PMC*, 57 F.4th at 1356 (finding express intent of unreasonable delay evidenced by internal document reflecting PMC's strategy to keep "patents hidden while industry infringement is quietly monitored" and enabling PMC "to exercise far-reaching market control for as long as 30 to 50 years") (citation omitted) *with Bogese*, 303 F.3d at 1365 (inferring implicit intent of unreasonable delay from applicant filing twelve continuation applications over eight years, without addressing Office actions and abandoning each previous application for a new one, which amounted to "deliberate . . . conduct . . . result[ing] in an exceptional delay").

A patentee's inaction—as opposed to taking action to further prosecution—is also indicative of implied wrongful intent.  In *Woodbridge*, the patentee requested the USPTO not issue his patent but file it in a secret archive for one year, according to a statute allowing such

delay in 1852, so he can file the patent internationally. *See* 263 U.S. at 52–53. The patentee, however, waited for nine and a half years before requesting patent issuance after noticing the increasing demand for his invention in 1861. *See id.* at 53. The Supreme Court rejected his claim, holding such inactivity for nine and a half years was unreasonable under the prosecution laches doctrine. *See id.* at 51; *see also Reiffin v. Microsoft Corp.*, 270 F. Supp. 2d 1132, 1156 (N.D. Cal. 2003) (explaining the "textbook case" of prosecution laches "involves a patent application filed and then followed by a lengthy period of unexplained *inactivity*") (citing *Woodbridge*, 263 U.S. at 56) (emphasis in original); *Lee*, 232 F. Supp. 3d at 156–58 (finding patentee's failure to take any action for more than eight years to "evince[] a concerted intent to delay prosecution") (citation omitted); *Seagen Inc. v. Daiichi Sankyo Co.*, 2022 U.S. Dist. LEXIS 125768, at *16 (E.D. Tex. July 15, 2022) (finding a fifteen-year prosecution delay not to be unreasonable because patentee was not "sitting on its hands" but was diligently prosecuting applications) (citation omitted).

Here, the district court concluded Sonos's normal serial continuation practice was unreasonable without engaging in a

meaningful intent analysis. *Cf.* Appx079–82. First, the record reflects no evidence of Sonos having express wrongful intent to delay—unlike *PMC*, which affirmed unreasonable delay after considering express evidence of internal memos reflecting PMC's intent to keep "patents hidden while industry infringement is quietly monitored" to "exercise far-reaching market control for as long as 30 to 50 years." 57 F.4th at 1356. *See generally* Appx079–82. Sonos followed the normal continuation practice protocols in filing and prosecuting its continuation applications. *See* Appx080–81. The district court's assertion about the possibility of earlier claiming finds no support in the record and is inconsistent with current continuation practice. *See* Appx079–82.

Second, the record does not reflect a pattern of egregious conduct in prosecution implying Sonos's wrongful intent to delay. In *Bogese*, the court found the patentee's filing twelve continuation applications over a period of eight years without response to the Office rejections and abandoning the previous application each time to demonstrate an intent to delay prosecution. *See* 303 F.3d at 1365. Unlike *Bogese*, Sonos only filed six applications spanning between 2013 and 2019. *See id.*; Appx080–81. As the district court admitted, Sonos diligently prosecuted

all applications, complying with statutory requirements with no indication of any burden to the USPTO. *See* Appx080–81.

Further, the record does not reflect Sonos's inaction during the prosecution of its patent family. Unlike in *Lee*, where the court found the patentee's failure to take any action for over eight years "evinces a concerted intent to delay," here, Sonos diligently prosecuted its applications at all times. 232 F. Supp. 3d at 156–58; *see also* Appx104. For Sonos, the only period of apparent inactivity was between September 11, 2007—when Sonos filed its first nonprovisional application—and March 8, 2011—when Sonos received the first non-final rejection from the USPTO related to said application. *See* Appx079–80. Sonos was not inactive but waiting for an Office action. Sonos's diligence is evidenced by receipt of the final rejection on this application only seven months after the first Office action refusal. *See* Appx079–80. Thus, like *Seagen*, Sonos was not "setting on its hand" during the prosecution period but was diligently prosecuting its applications. *Seagen*, 2022 U.S. Dist. LEXIS 125768, at *16; *see also* Appx079–80.

## 2. Requiring wrongful intent is consistent with other unenforceability defenses

Prosecution laches bears many similarities to the doctrine of inequitable conduct. *See* Robert A. Migliorini, *Lessons for Avoiding Inequitable Conduct and Prosecution Laches in Patent Prosecution and Litigation*, 46 IDEA 221, 257 (2006) ("Both [doctrines] are equitable doctrines that can not only render a patent unenforceable as an affirmative defense . . . but may also be used by the PTO to reject a patent application."). Acknowledging its destructive effect on patents, this court "tighten[ed] the standards for finding both intent and materiality in order to redirect [inequitable conduct, which] has been overused to the detriment of the public." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1288–89 (Fed.Cir.2011) ("[T]he remedy for inequitable conduct is the 'atomic bomb of patent law.'") (citation omitted). Likewise, this court has "tighten[ed] the standard" for a finding of prosecution laches—which has the same "atomic bomb" effect a finding of inequitable conduct imposes—by consistently requiring wrongful intent. *Id.* By ignoring intent, the district court's approach encourages accused infringers to improperly resort to laches every time a continuation patent is at issue, gutting continuation practice with each case. *See id.* ("atomic

bomb"); *see also supra* Section I.A.2.    After all, "[l]eft unfettered, [prosecution laches could plague] not only the courts but also the entire patent system." *Therasense*, 649 F.3d 1288–89.

### 3. A wrongful intent requirement will protect small and under-resourced businesses' good faith prosecution

Requiring wrongful intent protects good faith inventors—particularly small businesses—who resort to the cost-effective serial continuation practices to protect their inventions.    As explained above, small businesses rely on continuations to assess the market value of their inventions and seek "the full scope of patent protections to which they are entitled."    Hr'g Tr., at 111:4–7 (testimony of Brian Kearns); *see also id.* at 111:1–4 (testimony of Brian Kearns) ("It may take years for the applicant to determine which embodiments are both commercially valuable and entitled to patent protection over the prior art.").    An analysis of the totality of the circumstances heavily emphasizing pendency and not considering wrongful intent undermines small businesses' ability to secure patent protection efficiently.    *See* Kenneth Zahringer et al., *Time to Patent at the USPTO: The Case of Emerging Entrepreneurial Firms*, 43 J. TECH. TRANSFER 923, 932–49

- 37 -

(2018) (showing the average pendency of 15,505 patents issued to 910 life science small businesses was over seventy months for patents issued after 2011, reflecting small businesses' reliance on longer pendency for survival); *see also supra* Section I.B.2.

A wrongful intent requirement distinguishes small businesses who resort to serial continuations—like those Sonos used—to protect their inventions in good faith from those who deliberately seek to game the system for profit. *See Cordance Corp.*, 631 F. Supp. 2d at 491 (finding no prosecution laches in delay of over eight years because "[a]s with most small technology companies with limited resources, [patentee] had to be selective in filing patent applications"). By emphasizing pendency over wrongful intent, the district court effectively blurred the line between what is unreasonable and what is necessary for small business's survival. This holding directly opposes what this court teaches. *See Symbol II*, 422 F.3d at 1385.

## III. Conclusion

For the forgoing reasons, *amicus curiae* supports defendant-appellant's request to reverse the district court's prosecution laches holding.

Date: February 20, 2024          Respectfully submitted,

Jeffrey P. Armstrong
        *Counsel of Record*
Brian C. Bianco
AKERMAN LLP
71 S. Wacker Dr., 47th Floor
Chicago, IL 60606
(312) 654-5700
jeffrey.armstrong@akerman.com

Loletta Darden
Clinic Director and Visiting
Associate Clinical Professor
THE GEORGE WASHINGTON
UNIVERSITY LAW SCHOOL
INTELLECTUAL PROPERTY AND
TECHNOLOGY LAW CLINIC
2000 H St. N.W.
Washington, D.C. 20052
(312) 498-4179
loletta.darden@law.gwu.edu

*Counsel for Amicus Curiae*
The George Washington
University Law School
Intellectual Property and
Technology Law Clinic

# CERTIFICATE OF COMPLIANCE

1. This brief complies with the word-length type-volume limitation of Fed. Cir. R. 29(b) and 32(b).  This brief contains 6960 words, excluding the portions set forth in Fed. Cir. R. 32(b) and Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Practice Notes to Fed. Cir. R. 32.

3. This brief complies with the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6).

4. The brief has been prepared in a proportionally spaced typeface using Microsoft® Word for Windows 11 Home and 14-point Century Schoolbook type.


Date: February 20, 2024          */s/ Jeffrey P. Armstrong*

Jeffrey P. Armstrong
    *Counsel of Record*
Brian C. Bianco
AKERMAN LLP
71 S. Wacker Dr., 47th Floor
Chicago, IL 60606
(312) 654-5700
jeffrey.armstrong@akerman.com

Loletta Darden
Clinic Director and Visiting
Associate Clinical Professor
THE GEORGE WASHINGTON
UNIVERSITY LAW SCHOOL
INTELLECTUAL PROPERTY AND

TECHNOLOGY LAW CLINIC
2000 H St. N.W.
Washington, D.C. 20052
(312) 498-4179
loletta.darden@law.gwu.edu

*Counsel for Amicus Curiae*
The George Washington
University Law School
Intellectual Property and
Technology Law Clinic

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of February, 2024, the foregoing Corrected Brief of *Amicus Curiae* The George Washington University Law School Intellectual Property and Technology Law Clinic was submitted to the Office of the Clerk for the United States Court of Appeals for the Federal Circuit for filing using the court's CM/ECF system, which will transmit and serve electronic copies on all counsel registered to receive electronic notices in accordance with the Federal Rules of Civil Procedure.


Date: February 20, 2024          */s/ Jeffrey P. Armstrong*

                    Jeffrey P. Armstrong
                        *Counsel of Record*
                    Brian C. Bianco
                    AKERMAN LLP
                    71 S. Wacker Dr., 47th Floor
                    Chicago, IL 60606
                    (312) 654-5700
                    jeffrey.armstrong@akerman.com

                    Loletta Darden
                    Clinic Director and Visiting
                    Associate Clinical Professor
                    THE GEORGE WASHINGTON
                    UNIVERSITY LAW SCHOOL
                    INTELLECTUAL PROPERTY AND
                    TECHNOLOGY LAW CLINIC

2000 H St. N.W.
Washington, D.C. 20052
(312) 498-4179
loletta.darden@law.gwu.edu

*Counsel for Amicus Curiae*
The George Washington
University Law School
Intellectual Property and
Technology Law Clinic